UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN -- SOUTHERN DIVISION

KELLY BYSOUTH,
      Plaintiff,

-vs-                          Case No.
                                   Hon.
                                   **DEMAND FOR JURY TRIAL**

SECURITY CREDIT SOLUTIONS, LLC,
FIRST RELIANCE HOLDINGS, LLC,
TCF & ASSOCIATES, LLC,
SCOTT SARACINA,
THOMAS CALLAHAN,
MICHAEL ROSS,
LISA MCNAMARA,
ANN MCKNIGHT,
JOSEPH THOMPSON,
CURTIS SNOWDEN, and
JOHN DOE 1-3,
      Defendants.

## COMPLAINT AND JURY DEMAND

*Kelly Bysouth states the following claims for relief:*

### Parties

1. The Plaintiff to this lawsuit is Kelly Bysouth, who resides in Oakland County, Michigan.

2. The Defendants to this lawsuit are as follows:

    a. Security Credit Solutions, LLC ("SCS"), which is a foreign limited liability company doing business in Michigan.

    b. First Reliance Holdings, LLC ("First Reliance"), which is a foreign

limited liability company doing business in Michigan.

c.      TCF & Associates, LLC ("TCF"), which is a foreign limited liability

company doing business in Michigan.

d.      Scott Saracina, in his capacity as organizer or co-owner of SCS.  Upon

information and belief, Mr. Saracina regularly collects debts and is a

debt collector for purposes of the FDCPA, 15 U.S.C. § 1692a, manages

the operations of SCS, oversees collection activity of SCS, designed and

drafted the procedures and tactics to collect debts on behalf of SCS,

benefitted from the unlawful collection practices of SCS in the form of

collections, controls the day-to-day operation of SCS, indirectly engaged

in the collection of debts from Ms. Bysouth, engaged in the collection

of debts owed to another using instrumentalities of interstate commerce,

and engaged the services of other debt collectors to collect from Ms.

Bysouth.

e.      Thomas Callahan, in his capacity as an owner, operator and/or manager

of SCS.  Upon information and belief, Mr. Callahan regularly collects

debts and is a debt collector for purposes of the FDCPA, 15 U.S.C. §

1692a, manages the operations of SCS, oversees collection activity of

SCS, designed and drafted the procedures and tactics to collect debts on

2

behalf of SCS, benefitted from the unlawful collection practices of SCS in the form of collections, controls the day-to-day operation of SCS, indirectly engaged in the collection of debts from Ms. Bysouth, and engaged in the collection of debts owed to another using instrumentalities of interstate commerce.

f.      Michael Ross, in his capacity as an owner, operator and/or manager of SCS. Upon information and belief, Mr. Ross regularly collects debts and is a debt collector for purposes of the FDCPA, 15 U.S.C. § 1692a, manages the operations of SCS, oversees collection activity of SCS, designed and drafted the procedures and tactics to collect debts on behalf of SCS, benefitted from the unlawful collection practices of SCS in the form of collections, controls the day-to-day operation of SCS, indirectly engaged in the collection of debts from Ms. Bysouth, and engaged in the collection of debts owed to another using instrumentalities of interstate commerce.

g.      Lisa McNamara, in her capacity as a managing agent and/or employee of SCS. Upon information and belief, Ms. McNamara regularly collects debts and is a debt collector for purposes of the FDCPA, 15 U.S.C. § 1692a.

3

h.  Ann McKnight, in her capacity as organizer of SCS.  Upon information and belief, Ms. McKnight regularly collects debts and is a debt collector for purposes of the FDCPA, 15 U.S.C. § 1692a, manages the operations of SCS, oversees collection activity of SCS, designed and drafted the procedures and tactics to collect debts on behalf of SCS, benefitted from the unlawful collection practices of SCS in the form of collections, controls the day-to-day operation of SCS, indirectly engaged in the collection of debts from Ms. Bysouth, and engaged in the collection of debts owed to another using instrumentalities of interstate commerce.

i.  Joseph Thompson, who is the President of First Reliance.

j.  Curtis Snowden, who is the Chief Compliance Officer of First Reliance.

k.  John Doe 1 ("Edwin"), who identified himself to Ms. Bysouth as "Edwin," in his capacity as an employee and/or agent of SCS.

l.  John Doe 2, who is an owner, operator and/or manager of TCF.

m.  John Doe 3 ("Mr. Alvarez"), who identified himself to Ms. Bysouth as "Mr. Alvarez," in his capacity as an employee and/or agent of TCF.

### Jurisdiction

3.  This court has jurisdiction under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692k(d), the Telephone Consumer Protection Act

4

("TCPA"), 47 U.S.C. § 227, and 28 U.S.C. §§ 1331, 1337.

4.    This court may exercise supplemental jurisdiction over the related state law claims arising out of the same nucleus of operative facts which give rise to the federal law claims.

5.    In addition, this Court also has jurisdiction of this action under 28 U.S.C. § 1332(a).

6.    Ms. Bysouth resides in Oakland County, Michigan.

7.    Upon information and belief, no member of SCS resides in the State of Michigan.

8.    Upon information and belief, no member of First Reliance resides in the State of Michigan.

9.    Upon information and belief, no member of TCF resides in the State of Michigan.

10.    Other than Mr. Thompson, each individual defendant resides in New York.

11.    Mr. Thompson resides in Colorado.

12.    Diversity of citizenship exists between the parties.

13.    The amount in controversy – including actual damages, statutory damages, treble damages and attorney's fees – exceeds $75,000.

## Venue

14. The transactions and occurrences which give rise to this action occurred in Oakland County, Michigan.

15. Ms. Bysouth resides in Oakland County, Michigan.

16. Venue is proper in the Eastern District of Michigan.

## General Allegations as to SCS and First Reliance

17. On or about December 15, 2011, Cash Jar deposited funds into a Huntington Bank account.

18. Upon information and belief, those funds represented the principal amount of a "payday" loan issued to an individual who is not Ms. Bysouth.

19. Ms. Bysouth had no relationship to that account and did not know of its existence.

20. Ms. Bysouth had no relationship to the holder of that account and does not know that individual.

21. Ms. Bysouth did not apply for or take out the loan.

22. Ms. Bysouth never requested, received or used the funds from that loan.

23. Upon information and belief, the individual who took out the loan, failed to repay that loan.

24. Cash Jar then sold the debt to First Reliance to collect the debt.

25.  At all relevant times, First Reliance and its agents acted under the direction of Mr. Thompson and Mr. Snowden.

26.  Upon information and belief, Mr. Thompson and Mr. Snowden established the policies, procedures and practices of First Reliance in his capacity as the Chief Compliance Officer of First Reliance.

27.  First Reliance hired SCS to collect the debt.

28.  On or about January 9, 2014, Ms. Bysouth received a call from Lisa McNamara of SCS, who threatened Ms. Bysouth with prosecution and service of legal papers.

29.  SCS did not intend to initiate any legal proceeding or file charges.

30.  Ms. Bysouth returned the call.

31.  Ms. Bysouth heard an automated message system that announced "If you have been served a summons for a lawsuit from this office, please ask to speak with someone from the legal outsourcing department. Please hold for the next available associate, and have your file or case number on hand."

32.  The phone system them directed Ms. Bysouth to Edwin, who identified himself to Ms. Bysouth as "Edwin" and who verified her name and the last four digits of her social security number.

33.  Edwin informed Ms. Bysouth that a court proceeding had been initiated against

her for check fraud.

34.  No such proceeding had been filed.

35.  Edwin informed her that he saw a fraud alert on her file and he could show the judge her evidence of fraud.

36.  Edwin informed Ms. Bysouth that she could be served at her home or at her work place, Advantage Building Maintenance.

37.  Ms. Bysouth does not work at Advantage Building Maintenance.

38.  On or about January 20, 2014, counsel for Ms. Bysouth contacted SCS and spoke to Michael Ross.

39.  Mr. Ross informed counsel for Ms. Bysouth that Cash Jar was the original creditor/payday lender and that Cash Jar sold the debt to First Reliance, which then sold the debt to SCS.

40.  Mr. Ross further informed counsel for Ms. Bysouth that SCS no longer attempted to collect the debt.

41.  On or about January 20, 2014, counsel for Ms. Bysouth contacted SCS and spoke to Tom Callahan.

42.  Mr. Callahan acknowledged that Edwin had previously worked with SCS and placed the calls to Ms. Bysouth.

8

**General Allegations as to TCF**

43.    Prior to December 8, 2015, TCF was engaged to collect a debt allegedly owed by Ms. Bysouth.

44.    Alternatively, prior to December 8, 2015, TCF purchased a debt allegedly owed by Ms. Bysouth.

45.    At all relevant times, TCF and its agents acted under the direction of John Doe 2.

46.    Upon information and belief, John Doe 2 established the policies, procedures and practices of TCF in his capacity as an owner, operator and/or manager of TCF.

47.    At all times material and relevant hereto, TCF used, controlled and/or operated "automatic telephone dialing systems" as defined by the TCPA, 47 U.S.C. § 227 (a)(1) and 47 C.F.R. 64.1200(f)(1).

48.    TCF used an automatic telephone dialing system to place every call it placed to Ms. Bysouth.

49.    TCF called Ms. Bysouth's cell phone on each occasion that it placed a call to Ms. Bysouth.

50.    On or about December 8, 2015, TCF communicated with Ms. Bysouth for the first time.

9

51.  That communication came by a telephone call from Mr. Alvarez to Ms. Bysouth.

52.  Upon information and belief, Mr. Alvarez used "Mr. Alvarez" as a fictitious name.

53.  During that telephone call (and subsequent telephone calls), Mr. Alvarez attempted to collect the alleged debt from Ms. Bysouth.

54.  The alleged account and alleged debt referenced by Mr. Alvarez never have belonged to Ms. Bysouth.

55.  Ms. Bysouth never received any written statement from TCF or Mr. Alvarez containing each of the following:

    a.  the amount of the alleged debt;

    b.  the name of the creditor to whom the alleged debt is owed;

    c.  a statement that, unless Ms. Bysouth disputed the debt within thirty days of receiving the written statement, TCF would assume the debt to be valid;

    d.  a statement that, if Ms. Bysouth disputed the debt in writing within thirty days of receiving the written statement, TCF would obtain verification of the debt and mail the verification to Ms. Bysouth; and

    e.  a statement that, upon Ms. Bysouth's written request within thirty days

of receiving the written statement, TCF would provide the name of the original creditor, if different than the current creditor.

## COUNT I – FDCPA, 15 U.S.C. § 1692 *et seq.* (TCF and John Does 2 and 3)

56.   Ms.Bysouth incorporates the preceding allegations by reference.

57.   At all relevant times, TCF – in the ordinary course of its business – regularly engaged in the practice of collecting debts on behalf of other individuals or entities.

58.   TCF and John Does 2 and 3  are "debt collectors" under the FDCPA, 15 U.S.C. § 1692a(6).

59.   At all times relevant to this complaint, each defendant sought to collect a "consumer" debt from Ms.  Bysouth.

60.   TCF's, John Doe 2's and John Doe 3's actions to collect this alleged debt from Ms. Bysouth violated the provisions of the FDCPA including, but not limited to: 15 U.S.C. §§ 1692d; 1692e and 1692g.

61.   Ms. Bysouth suffered damages as a result of these violations of the FDCPA.

## COUNT II – TCPA, 47 U.S.C. § 227 (TCF)

62.   Ms. Bysouth incorporates the preceding allegations by reference.

63.   The central business mission of TCF is the collection of consumer debts using the United States mail service, telephone, telegram or other instrumentalities

of interstate and intrastate commerce.

64.   TCF regularly attempts to collect consumer debts alleged to be due another.

65.   At all times material and relevant hereto, TCF used, controlled and/or operated "automatic telephone dialing systems" as defined by the TCPA 47 U.S.C. § 227(a)(1) and 47 C.F.R. § 64.1200(f)(1).

66.   Ms. Bysouth never gave permission to TCF to call her cell phone number.

67.   TCF negligently violated the TCPA in relation to Ms. Bysouth.

68.   As a result of TCF's negligent violations of the TCPA, Ms. Bysouth may recover statutory damages of $500.00 per call in violation of the statute.

69.   Alternatively, TCF knowingly or wilfully violated the TCPA in relation to Ms. Bysouth.

70.   As a result of TCF's willful violations of the TCPA, Ms. Bysouth may recover statutory damages of up to $1,500.00 per call in violation of the statute.

## COUNT III – Michigan Occupational Code, as alternative to claims under the Michigan Collection Practices Act (All Defendants)

71.   Ms. Bysouth incorporates the preceding allegations by reference.

72.   Each defendant is a "collection agency" as that term is defined in the Michigan Occupational Code ("MOC"), M.C.L. § 339.901(b).

73.   Ms. Bysouth is a debtor as that term is defined in M.C.L. § 339.901(f), as she

is allegedly obligated to pay the debt at issue.

74.   Each defendant violated the MOC including, but not limited to, the following: M.C.L. §§ 339.915, 339.917, and 339.918.

75.   Ms. Bysouth has suffered damages as a result of these violations of the MOC.

76.   These violations of the MOC were willful.

### COUNT IV – Michigan Collection Practices Act, as alternative to claims under the Michigan Occupational Code (SCS, First Reliance and TCF)

77.   Ms. Bysouth incorporates the preceding allegations by reference.

78.   SCS, First Reliance and TCF are "regulated persons" under the Michigan Collection Practices Act ("MCPA"), M.C.L. § 445.251(g).

79.   SCS's, First Reliance's and TCF's acts in attempting to collect the alleged debt from Ms. Bysouth constitute violations of the MCPA including, but not limited to, the following: M.C.L. § 445.252.

80.   Ms. Bysouth has suffered damages as a result of these violations of the MCPA.

81.   These violations of the MCPA were willful.

### Demand for Jury Trial

82.   Ms. Bysouth demands trial by jury in this action.

### Demand for Judgment for Relief

83.   *Accordingly, Ms. Bysouth requests that the Court grant:*

13

a.   *Equitable relief under statute and common law, in the form of a declaration that the amount sought by Defendants is not actually owed and an injunction prohibiting further collection of those amounts.*

b.   *Actual damages for items including emotional distress, mental anguish, frustration, humiliation, and embarrassment.*

c.   *Statutory damages.*

d.   *No less than treble damages.*

e.   *Statutory costs and attorney fees.*


Respectfully Submitted,

LYNGKLIP & ASSOCIATES
CONSUMER LAW CENTER, PLC

By: /s/ Carl Schwartz
Carl Schwartz (P-70335)
Attorney for Kelly Bysouth
24500 Northwestern Highway, Ste. 206
Southfield, MI 48075
(248) 208-8864
Carl@MichiganConsumerLaw.com

Dated: February 5, 2016